UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at PIKEVILLE

CRIMINAL ACTION NO.7:10-cr-40-ART

UNITED STATES OF AMERICA,                                            PLAINTIFF,

V.          **MAGISTRATE JUDGE'S REPORT &
                   RECOMMENDATION**

DENNIS DYKES,                                                         DEFENDANT.

\* \* \* \* \* \* \* \* \*

This matter is before the undersigned on Defendant Dennis Dykes' Motion to Withdraw Guilty Plea. [Record Nos. 29 & 59]. A hearing was held regarding this matter on November 14, 2012. After consideration of the testimony and other evidence before the Court, it is recommended that the motion be denied.

## I. BACKGROUND

Defendant Dennis Dykes was charged by the Grand Jury on November 18, 2010 of possessing a prohibited item for having a shank or homemade knife while incarcerated at United States Penitentiary Big Sandy in violation of 18 U.S.C. § 1797(a)(2). [Record No. 1]. Patrick Nash was appointed by the Court to represent Dykes. [Record Nos. 9 & 13]. On motion of the Defendant [Record No. 19], a rearraignment was held March 17, 2011 where Dykes pled guilty to the charge in the indictment. [Record Nos. 21, 25, & 26]. During the rearraignment, the Court found Dykes competent to enter a plea and that his decision to plead guilty was knowing and voluntary. [Record No. 28, at 22.1-4].

On May 13, 2011, Dykes submitted a *pro se* motion seeking to withdraw his guilty plea. [Record No. 29]. Dykes claimed as grounds that he "was bam-boozle [sic] and pressed into taking

a Plea Agreement because of [his] learning disability and slow ability to comprehend and duress and coerced inflicted [sic] by the counsel, Attorney Patrick Nash." [Record No. 29, at 2]. A hearing was first held on the motion on May 26, 2011 at which the Court granted the United States' motion for a competency evaluation. [Record No. 33]. The Court then denied without prejudice Dykes' motion to withdraw his guilty plea giving leave to refile after the result of the competency evaluation. [Record No. 37]. After the evaluation was completed, a competency hearing was held on August 31, 2012, where Dykes was found competent to stand trial. [Record No. 59]. At this hearing, Dykes renewed his motion to withdraw his guilty plea and, consequently, Patrick Nash was relieved from his duty as counsel for Dykes and Stephen Owens was appointed as new counsel for Dykes. [Record Nos. 59 & 61].

A hearing was held on the Motion to Withdraw Guilty Plea on November 14, 2012. At the hearing, Dykes testified in support of his motion to withdraw. He testified that during March of 2011, he was depressed and suffering from family issues. Dykes asserted that his attorney, Mr. Nash, did not explain the charges asserted against him or the plea deal to him. According to Dykes, Mr. Nash did not know of any defenses available to him and put responsibility for coming up with any defense to the charges on Dykes. He further claimed that he was not in the right state of mind and not aware of what was going on when he signed the plea deal and pled guilty in front of the Court. Dykes testified that he did not realize what he was signing and his admissions to the charges during his rearraignment were only what Mr. Nash told him to say, not his own belief or answers.

The government called Patrick Nash who testified that he has been a contract public defender for the Eastern District of Kentucky for nineteen (19) years and has handled between twenty (20) and fifty (50) cases per year as appointed counsel during that time. While his testimony was limited

by the attorney client privilege, Mr. Nash testified that he visited Dykes three (3) to five (5) times prior to his plea and felt he had adequate time to visit with Dykes. Further, Mr. Nash did not feel as if Dykes felt forced to plead guilty and did not force him to plead guilty. The government then called Dr. Terry King, chief psychologist for the Bureau of Prisons at Big Sandy. Dr. King testified that while Dykes was on the Special Housing Unit at Big Sandy, monthly evaluations were performed of all inmates housed on the Unit, including Dykes. The evaluation reports of December 2010, January 2011, February 2011, and April 2011[1] showed no signs of mental health concerns and Dykes did not express any complaints of depression or family issues. Only on April 27, 2011 did Dykes express any thoughts of hurting himself or suicide. During the resulting evaluation, Dykes made statements about being suicidal and depressed, which he later retracted. He did mention family issues and spoke about his recent experience in court and pleading guilty, but said nothing to the effect that he felt pressured or forced into the plea deal. The transcript of the rearraignment, an internal memorandum from the Bureau of Prisons, the Defendant's presentence report completed by the United States Probation Office in the District of Maryland, and certain prison records of the Defendant were admitted as exhibits for the Court's consideration.

## II. ANALYSIS

FEDERAL RULE OF CRIMINAL PROCEDURE 11(d)(2) states that a defendant may withdraw a guilty plea after it has been accepted by the Court if "the defendant can show a fair and just reason for requesting the withdrawal." FED.R.CRIM.P. 11(d)(2)(B). The Sixth Circuit had determined seven factors to determine whether a fair and just reason has been presented: 1) the amount of time that

---

[1] An evaluation was not performed in March of 2011 because at the scheduled time for such evaluation, Dykes was before this Court and not present at Big Sandy for evaluation.

elapsed between the plea and the motion to withdraw it; 2) the presence or absence of a valid reason for the failure to move for withdrawal earlier in the proceedings; 3) whether the defendant has asserted or maintained his innocence; 4) the circumstances underlying entry of the guilty plea; 5) the defendant's nature and background; 6) the degree to which the defendant has had prior experience with the criminal justice system; and 7) the potential prejudice to the government if the motion with withdraw is granted. *See, e.g.*, United States v. Bazzi, 94 F.3d 1025, 1027 (6th Cir. 1996); United States v. Bashara, 27 F.3d 1174, 1181 (6th Cir. 1994), *abrogated on other grounds by statute*. While these factors are non-exclusive with no one factor controlling, this list was designed to ensure that defendants do not attempt to withdraw a plea made solely because they later come to regret making a plea. Bazzi, 94 F.3d. at 1027; United States v. Goddard, 638 F.3d 490, 494 (6th Cir. 2011). "Courts have noted that the aim of the rule is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant 'to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty.'" United States v. Alexander, 948 F.2d 1002, 1004 (6th Cir. 1991) (quoting United States v. Carr, 740 F.2d 339, 345 (5th Cir. 1984)).

As grounds for withdrawing his plea, Dykes now claims that he was suffering from depression and a state of mind that prevented him from understanding the charges against him and the plea deal to which he was agreeing. Dykes further asserts that his attorney was ineffective and did not explain the plea deal or charges against him and told Dykes to sign the deal without telling him what he was signing.

*A. Depression and State of Mind*

In his testimony, Dykes claimed that he was suffering from depression and was not in the right state of mind to understand the plea he was entering. His family situation and incarcerated state contributed to his altered state of mind and Dykes even contemplated suicide. Dykes was not able to think clearly and understand the charges against him or the deal to which he was agreeing. However, testimony by Mr. Nash and Dr. King suggested no indications of depression or cognitive difficulties until more than a month after the entry of his plea.

Dykes' prison records show a history of disruptive and rebellious conduct. Significantly, his records show a marked increase in Dykes' disobedient behavior after March 17, 2011, when he entered his plea. During the four (4) months of March, April, May, and June 2011, there were nine (9) incidents reported resulting in Dykes being disciplined. Further, six (6) of the nine (9) incidents occurred between the time Dykes entered his guilty plea and when he motioned to withdraw it. Of these six (6) incidents, a hearing was held on five (5) of them during that same time. Additionally, there are several instances where Dykes refused to sign paperwork, denied his conduct or involvement, or refused to make a comment relating to the incidents.

The evidence suggests that Dykes was angry, frustrated, and maybe even depressed, demonstrated by the sharp rise in disruptive behavior. However, this evidence suggests that Dykes displayed signs of anger, frustration, and possibly depression *after* he entered his guilty plea. When Dykes did display this behavior potentially indicating depression, he was able to refuse to sign paperwork and deny charges leveled against him. This clearly indicates he was fully capable of doing the same during the time period immediately prior to and when the plea was entered, before any signs of depression were present. Moreover, the lack of any signs of depression or an altered state of mind prior to March 17, 2011 as shown by his psychological evaluations, indications of

counsel, and his own behavior further support that Dykes' plea was made knowingly and voluntarily. This weighs against Dykes in considering the circumstances surrounding the plea, his nature and characteristics, his reason for delaying withdrawal of his plea, and his assertions of innocence.

### B. Deficient Representation

Dykes testified that his attorney, Patrick Nash, failed to explain the charges leveled against him or the plea deal to which he agreed. He further claimed that Mr. Nash only visited him a few times and did not seem to know any defenses available to Dykes. Dykes testified that Mr. Nash only showed Dykes one (1) picture of the government's discovery, but later in his testimony stated that he discussed with Mr. Nash the internal memorandum of the Bureau of Prisons relating to the incident. Mr. Nash put the onus on Dykes to come up with any defense to the charge. Dykes also asserted that he did not know he was signing a plea deal when he signed it and said what Mr. Nash had told him to say when pleading guilty before the Court. On cross-examination, the government questioned Dykes about his contradictory answers during rearraignment. Specifically, the government pointed out that Dykes answered affirmatively when asked by the Court if he was satisfied with his representation, [Record No. 28, at 7.14-16], as well as the following exchange:

> The Court: Okay – did you read [the plea deal and sealed supplement] before you signed them?
> The Defendant: Yes.
> The Court: Okay – did you get the chance to speak with Mr. Nash about these documents before you signed them?
> The Defendant: Yes, I did.
> The Court: Okay – did you understand these documents when – when you signed them?
> The Defendant: Yes.
> The Court: Is there anything about the documents that you were – you believe you did not understand when you signed them?
> The Defendant: No.

[Record No. 28, at 8.17-9.4]. Dykes recognized that he had given answers to the Court that

6

contradicted his testimony, but claimed it was due to his state of mind and that he did not really know what was happening. He further claimed that he did not tell the Court the issues with his mental state because he did not think it was relevant.

Mr. Nash testified that in his capacity as a contract public defender for the Eastern District of Kentucky he has represented between 380 and 950 clients. Mr. Nash invoked the attorney client privilege and refused to testify as to the topics of conversation between him and Dykes during the course of his representation. He did however testify that he was satisfied with the amount of time he was able to spend with Dykes, did not feel as if Dykes felt forced to plead guilty, and did not force him to plead guilty.

Dykes claims that he did not think his depressed and confused state of mind during rearraignment was relevant and failed to bring it and his problems with counsel to the Courts attentions. However, the motion to withdraw his plea shows that he did at some point come to believe it was relevant and should be brought to the Court's attention. Additionally, during rearraignment the Court posed several questions relevant to Dykes' mental state and the sufficiency of his representation, including whether he was satisfied with Mr. Nash's legal advice and representation and whether he was able to understand the plea deal before he signed it. [*See, e.g*, Record No. 28, at 5.12-7.16 & 8.17-9.4]. Clearly, the Court expressed that the issues of his representation and mental state were relevant and gave Dykes ample opportunity to express his concerns. Further, as Dykes was under oath, it should have been clear to him that it was his duty to answer the Court's questions truthfully and, whether he believed it germane or not, his duty to answer the Court's questions truthfully should have superseded and alleviated any question as to relevancy. If he truly was unhappy with his representation and did not understand the charges and

plea, by failing raise these issues with the Court Dykes knowingly violated his duty of honesty. Further, if Dykes did not know an answer to a question posed by the Court, he was aware he could answer truthfully reflecting his lack of knowledge, as illustrated when the Court asked him if the shank was six (6) and one (1) half inches long and Dykes responded that he was not sure. [Record No. 28, at 20.25-21.2]. Additionally, the experience of counsel, his demeanor, and his representations significantly weigh against Dykes' claims. Mr. Nash has been assigned to at least 380 criminal clients in the federal system, making Dykes' claims of counsel's confusion and lack of knowledge hollow. Moreover, while Dykes testified as to the interactions with Mr. Nash, arguably waiving the attorney client privilege, Mr. Nash refused to testify as to his discussions with Dykes to exculpate himself, asserting that it was the client's decision to waive the privilege. His testimony conveyed his respect for his clients' autonomy and careful deference to the judgment and decisions of clients. This weighs against the presence of a valid reason for failing to withdraw the plea earlier, the circumstances of the plea, and his assertion of innocence.

### *C. Other Factors*

Dykes has had extensive experience with the criminal justice system, having been convicted on at least six (6) separate occasions and pled guilty before a federal district court previously. His prison records show a history of disruptive and violent behavior. The records further show that Dykes has on separate occasions admitted to guilt, denied guilt, or refused to respond to different charges by the Bureau of Prisons. His actions of refusing to sign documents, refusing to obey orders and perform work duties, and insolence while incarcerated show that he is not a person likely to let someone force him to do anything. Further, Dykes was cited on at least two (2) other occasions as being in possession of a shank, undermining his claim that he did not understand the charge of

possession of a shank in the indictment.  Moreover, the internal memorandum of the Bureau of Prisons which states that Dykes admitted to possession of the shank weighs against his protestations of innocence. Further, while he claims he told Mr. Nash he was innocent, he admitted guilt at the rearraignment and his *pro se* motion to withdraw his plea does not assert innocence to the charge. These considerations weigh against his prior experience with the criminal justice system, his nature and background, and his assertions of innocence.

### III. CONCLUSION

Dykes has failed to show a fair and just reason to allow him to withdraw his guilty plea. As the analysis above shows, the factors of the presence or absence of a valid reason for failing to withdraw his plea earlier, whether he has maintained or asserted his innocence, the circumstances underlying the entry of his plea, his nature and background, and his prior experience with the criminal justice system all weigh heavily against allowing Dykes to withdraw his plea. The evidence shows that Dykes did not have an "unsure heart and confused mind" borne from haste when he entered his plea. United States v. Alexander, 948 F.2d 1002, 1004 (6th Cir. 1991)   Dykes seems to have instead become angry and frustrated with his situation following his "tactical decision to enter a plea" and came to believe "he made a bad choice in pleading guilty" leading to his attempt to withdraw it. United States v. Carr, 740 F.2d 339, 345 (5th Cir. 1984)).

Accordingly, having considered the matter fully and for the reasons stated above,

IT IS RECOMMENDED that the Defendant's Motion to Withdraw Guilty Plea [Record Nos. 29 & 59] be DENIED.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days from the date of service thereof or further appeal is waived.  United States v. Campbell, 261

F.3d 628, 632 (6th Cir. 2001); Bituminous Cas. Corp. v. Combs Contracting Inc., 236 F. Supp. 2d 737, 749-750 (E.D. Ky. 2002).  General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal.  Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004); Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995).

Signed November 21, 2012.



Signed By:
Edward B. Atkins
United States Magistrate Judge